**Opinion filed February 7, 2019**



In The

# Eleventh Court of Appeals

_____

## No. 11-17-00050-CR

_____

## LEAMON GRANT WEST, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 238th District Court

Midland County, Texas

Trial Court Cause No. CR48034

## M E M O R A N D U M   O P I N I O N

The jury convicted Leamon Grant West of the offense of aggravated assault with a deadly weapon, as charged in Count I of the indictment, and of the offense of unlawful restraint, as charged in Count II of the indictment. The jury assessed Appellant's punishment at confinement for ten years as to Count I and at confinement for ten years as to Count II. However, the jury recommended that the sentence on the unlawful restraint count be suspended and that Appellant be placed

on community supervision. The trial court imposed the ten-year sentence on Count I but suspended the imposition of the sentence as to Count II and placed Appellant on community supervision for a term of ten years. Appellant brings five issues on appeal. The way that we read Appellant's issues, three bear implications of evidence sufficiency, one is related to ineffective assistance of counsel, and the other relates to jury argument issues. We affirm.

Under Appellant's "Points of Error" I, II, and V, he basically challenges the sufficiency of the evidence to support a conviction at all, urges that his conviction based upon insufficient evidence is a denial of due process, and argues that there is insufficient evidence of *mens rea* or scienter. We will consider these issues together.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). When we conduct a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts

in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. "Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of an appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

The victim in this case was Hillery Suzanne West, a fifth-grade science and social studies teacher. She was Appellant's wife, but at the time of the incident under review, she had filed for a divorce. Appellant had threatened to kill himself when Hillery moved out.

According to Hillery's testimony, Appellant showed up at her home around 8:50 on the evening of the alleged offense. He had a laundry basket of clothes with him and told Hillery that the basket had some of her clothes in it. Unbeknownst to Hillery, the basket also contained a sawed-off .410 shotgun and a pair of handcuffs.

When Hillery answered the door, Appellant "pushed the laundry basket, knocked [her] on [her] butt, and immediately dropped the basket." Appellant tried to put the handcuffs on Hillery, but she "ripped [her] hand out."

Hillery also testified that Appellant shut the door, knocked her back down, and "pulled the shotgun out of the basket." He took two "bullets" from his pocket and told Hillery: "This is how this is going to go. I have two bullets . . . . One's for you, one's for me. We're not walking out of here tonight." Hillery said: "Are you for real? This is where we're going to go?" Appellant began "cussing and cussing," grabbed her by her hair, took her to the living room, put his hands on her throat, and held her down on the couch. By this time, Appellant had put the "bullets" into the gun.

Throughout, Hillery's phone kept ringing. Appellant had taken her cell and home phones, and he would not let her answer the calls. Hillery ultimately told Appellant that, if he did not answer the phone, her neighbor, Rene Johnson, would come to check on her. Appellant replied: "Good. I want her to come over here

3

because I'm going to kill her too." Appellant finally let Hillery call Johnson. The entire time that she was on the phone, Appellant held the gun to her cheek.

At some point in time, Appellant needed to go to the bathroom. He took Hillery with him; the shotgun was in the small of her back as they walked to the bathroom. Appellant made Hillery stand in the bathtub while he urinated.

At one point, Appellant made Hillery go to the bedroom. He asked Hillery where her wedding ring was and where a certain T-shirt was. He grabbed her by the throat and held her down on the bed before he "marched" her back to the living room.

Hillery testified that the gun stayed on her the entire time and that, every time she tried to talk, "he would get that gun up and just get right in my face." At one point during the confrontation, Appellant told Hillery that, if she did not shut up, he "was going to blow [her] effing head off."

Hillery decided to tell Appellant whatever he wanted to hear. She told Appellant that she was sorry and that they could go to counseling or go to the pastor at her church. Appellant unloaded the shotgun and put it and the "bullets" on the kitchen counter. She hugged him and tried to calm him down. After Appellant had calmed down, Hillery called Johnson to tell her that everything was okay. Johnson asked Hillery if she wanted to call off the police. Hillery told her, "No." Appellant and Hillery sat on the couch until the police arrived. Hillery testified that the ordeal lasted for about an hour and twenty minutes and that she thought Appellant was "going to kill [her]."

Johnson testified that she and Hillery had worked together as employees of the Midland Independent School District for four and one-half years. Johnson and Hillery were also best friends and attended church together. They talked by phone every day, usually toward nighttime. At the time of the offense, Johnson knew that Hillery and Appellant were in the process of getting a divorce.

4

On the night of the offense, Johnson tried to call Hillery, as was usual. However, Hillery did not answer. Later, Hillery called Johnson. Johnson testified that she could tell by the tone of Hillery's voice that something was wrong. Hillery told Johnson that she was okay and hung up the phone.

After the phone conversation with Hillery, Johnson noticed that Appellant's car was at Hillery's home. Johnson talked to a neighbor and then called 9-1-1. While Johnson was waiting on the police to arrive, Hillery called again. Johnson told Hillery that she had called the police and asked whether Hillery wanted her to "call them off"; Hillery said, "No."

Midland Police Officers Alexander Duwel and Timothy Arnold arrived at Hillery's home in about ten to twenty minutes after Johnson called 9-1-1. Officer Arnold testified that it was 10:15 p.m. when they received the dispatch to respond to the mobile home park where Hillery lived. Officer Duwel testified that, when he and Officer Arnold went into Hillery's home, Hillery was "very frightened" and "breathing pretty heavy" and that "her hair was kind of disheveled." Officer Arnold testified that, when he first saw Hillery, she was "pale white" and looked "very afraid." Johnson also testified as to Hillery's appearance and demeanor. When Johnson saw Hillery after the officers left, Hillery was very distraught and was crying and upset: "she was a mess." Johnson spent much of the rest of the night with Hillery.

Meanwhile, when Officer Arnold entered the home, Appellant stood up, turned his back to Officer Arnold, and put his hands behind his back. Officer Arnold handcuffed Appellant and took him outside.

The officers found a sawed-off .410 shotgun and two .410 shells on the kitchen counter, and they also found a pair of handcuffs on the living-room floor. Officer Duwel ran a check on the sawed-off shotgun and determined that it belonged to Appellant.

5

Officer Duwel talked with Hillery; Officer Arnold dealt with Appellant. Hillery did not want to talk to Officer Duwel at first; she "kept looking over in the direction of the male." Hillery did not talk with Officer Duwel until Appellant was no longer in the home. When Hillery was finally able to talk to Officer Duwel, she told him that Appellant had tried to put handcuffs on her; that he had taken the two shotgun shells from his pocket and told her, "One's for you, and one's for me"; and that he then loaded the gun.

After Officer Duwel told Officer Arnold about the conversation with Hillery, the officers placed Appellant in a patrol car. There is some confusion in the record about whether the officers put Appellant in Officer Duwel's patrol car or Officer Arnold's patrol car. Officer Arnold testified that Officer Duwel transported Appellant to the jail and that he (Officer Arnold) went back on patrol. On the other hand, Officer Duwel testified that he talked to Appellant after Officer Arnold had placed Appellant in the backseat of Officer Arnold's patrol car. Regardless, the trial court admitted a video of that conversation. Officer Duwel testified that Appellant did not say that he had planned to kill himself. Rather, Appellant said that he had brought the gun only as a threat.

Appellant elected to testify. He testified that Hillery had invited him to her home that evening so that they could attempt to work out some custody issues in connection with their divorce. When he arrived at Hillery's home, he had been drinking all day. Hillery let him in.

Appellant testified that he took the sawed-off shotgun, the two shotgun shells, and the handcuffs with him to Hillery's home. His intent was to force Hillery to watch him kill himself. Appellant denied that he ever put handcuffs on Hillery. He also denied that he ever threatened her or told her that one of the shells was for her and one was for him; he brought only two shells because that is all he had. Furthermore, he denied making Hillery accompany him at gunpoint to the bathroom.

6

He testified that Hillery stayed in the living room and that he did not take the shotgun with him.

As to Hillery's claim that Appellant held the shotgun on her throughout the ordeal, Appellant claimed that, when he was talking with Hillery, he had the shotgun but that it was lying across his lap. Appellant testified that he put the shotgun on the kitchen counter when Hillery said, "Please put [the shotgun] over there. I would feel safer."

The record also contains a letter that Appellant had written the day before. The letter was to Appellant and Hillery's fifteen-year-old son. In the letter, Appellant apologized for what he was about to do and told his son to take care of his younger siblings.

Appellant argues that the evidence is conflicting and that the State failed in its proof of *mens rea*. The jury is the sole judge of the witnesses' credibility, and we defer to that resolution when asked to review the sufficiency of the evidence. *See Brooks*, 323 S.W.3d at 899. As indicated by our recitation of facts above, we have reviewed all the evidence in the light most favorable to the verdict, and we hold that a rational trier of fact could have found, beyond a reasonable doubt, the essential elements of the offenses with which the State charged Appellant, including the *mens rea* of those offenses. *See Jackson*, 443 U.S. at 319; *Isassi*, 330 S.W.3d at 638. We overrule Points of Error I, II, and V.

In Point of Error III, Appellant claims that he received ineffective assistance of counsel. In order to prevail on an ineffective-assistance-of-counsel claim, Appellant must show that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that the result would have been different if not for counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005); *Thompson v. State*, 9 S.W.3d 808, 812–13 (Tex. Crim. App. 1999). We must indulge

7

a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance, and Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). We entertain a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the trial of the case in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690.

"[A]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). Under normal circumstances, the record on direct appeal is generally undeveloped and rarely will it be sufficient to overcome the presumption that trial counsel rendered effective assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). The Court of Criminal Appeals has said that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). In the absence of trial counsel's having had the opportunity to explain his actions, we will not find that counsel's performance was deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

Appellant's complaints are that he called his attorney sixty times in one week to no avail; that his counsel should have made unnamed objections to unnamed evidence; and that counsel was obviously distracted and ineffective because, during his jury argument, he kept referring to the victim as Hillary Clinton rather than the true name of the victim, Hillery West. Such broad statements without more do not show that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that the result would have

8

been different if not for counsel's errors. Appellant has not overcome the strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance. We overrule Point of Error III.

In his Point of Error IV, Appellant complains of improper jury argument. He did not make that objection in the trial court. An objection to improper jury argument must be made in the trial court or it is waived. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996); *see* TEX. R. APP. P. 33.1(a). We overrule Point of Error IV.

We have overruled all of Appellant's points of error. We affirm the judgments of the trial court.


JIM R. WRIGHT
SENIOR CHIEF JUSTICE


February 7, 2019

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[1]

Willson, J., not participating.

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.